Thank you, Your Honor. Pleased to court, I'm James Tree and I'm here today pleased to represent Marie Mathews in a social security disability claim. Ms. Mathews, she'll turn 50 this year. When she was 18, though, she was riding on a motorcycle and got severe injuries to her left leg. Required multiple surgeries, including an open reduction and internal fixation with As a result of that, she applied for SSI disability back at that time and was immediately awarded benefits because her injuries were so severe. Can I interrupt you for just a second? I think we've all read the facts and are familiar with them. I've got a question for you. There were two reports written by Dr. Weber, one in December, I believe, of 2013, another one in January of 2015. Is there any evidence that Dr. Hale reviewed either one of those two reports? Dr. Hale did not review either of those reports. Dr. Hale did not review the photographs. There's no indication that Dr. Hale reviewed the MRI. Did he ever express an opinion as to whether or not those two reports stated her physical condition or physical disability in error? No. In fact, when he did review the limited amount of information previously from Dr. Weber, Dr. Hale said, I give Dr. Weber great weight, which is consistent with Social Security regulations that we generally give great weight to the treating physician. So the part that he did review, he agreed with Dr. Weber's analysis. He didn't review the important parts of Dr. Weber's opinions. He never saw them. They were never given to him, and he didn't contradict them. Can I ask you an embarrassing question, because I should know the answer, but you're an expert in this area, so you'll know. Your client alleges an onset date for purpose of these proceedings of May of 2011, I think, right? Yes. Go ahead. No, no. Okay. I think that's a really important part that the administrative law judge really, to me, I guess, messed up on, is because when she first, and as a matter of fact, I wanted to open this here to the record to 220. It's before Ms. Matthews was represented. She filed on her own. She went into the Social Security Administration. A couple things happened. First of all, when she went in there and saw the Social Security worker, the worker made a note. She needs to use a cane, and she had a cane and noted it in her observations when she first applied for disability benefits. She was asked, when did you stop working? She said, I stopped working July of 2009. She said, did you stop working because of your impairment? She said, no, I got fired. She then said, was asked, well, when did your condition, even though you didn't stop because of your condition, when did your condition stop you from being able to work full time? She said, interestingly, 2008. Not because she worked in 2008 and 2009, but she was missing a lot of work. That's reflected in the record. Okay. I think my question maybe was going in the opposite direction. What I'm wondering is, in order to reverse here, do we have to find that the record compels the conclusion that she was disabled as of May 2011? Or, alternatively, let's say that we became convinced that she was disabled. The record shows she was disabled, but at a later point. Does that not help you? Do we have to find it as of May of 2011? No. For example, if you found it as of Dr. Weber's date of his first report, or of, he said in his report that his opinions had been consistent since July of 2011, which is two months after the May date. Okay. Well, I guess my, yeah, go ahead. So it would be error for the ALJ to have, even if the evidence showed she was disabled at a later date than May of 2011, to deny her completely because his decision is through the date of his decision. Got it. That's what I was wondering. Thank you. Yeah. So that would be clear error if the ALJ did that. And the reason I ask that is that it seemed to me, I'm a little hazy now on the particulars, but there was, as of May of 2011, I would say that the record, I don't know, you could kind of read it either way. There was some later point where Dr. Weber came in that it seemed much clearer, but it was after the onset date she alleged. That was the concern. And at the hearing, she was alleging 2009, and that she actually felt like she couldn't work as of 2008. Significant in the record is the judge made a point out of after 2011, she only saw Dr. Weber seven times. But prior to that, she saw Dr. Weber in this record 25 times, plus the ARNP two times, a total of 35 visits to Dr. Weber's office. Dr. Weber personally saw her 32 of those 35 times. Now, much of those visits were in 2008. She told Dr. Weber contemporaneously in 2008, I'm having to delegate a lot of my work to another coworker at this check cashing place because I can't do it any longer. She told Dr. Weber that she was missing work, and some months she was only able to work a total of five days during the month. Her employer accommodated her until July of 2009 when he said that he was firing her because she held a check too long. There was nothing nefarious about that. It was a payday loan place where a person would come in and give them a postdated check to the date of their next payroll check so that they could get a loan with interest. And the record shows that she didn't like the collection part of it. And she was trying to help somebody out, and she held the check too long, and they used that as the reason to get rid of her. Now, what is significant about all this is because the judge didn't look at 2008 when she was having significant problems. So she was on disability seven years. She got off of disability. She worked for ten years. In 2006, she went to Dr. Weber, and Dr. Weber says, I haven't seen her for two years. She's doing much better. She's only on ibuprofen over-the-counter. Then as 2007 and 2008 approached, Dr. Weber prescribed her morphine, first 15 milligrams, then 30 milligrams, then 60, then 90, then 120 milligrams. He put her on the maximum dosage of Vicodin and the maximum dosage of gabapentin because she had nerve damage. In 2008, he sent her for an MRI. It's a bad MRI. It's at 324 in the record, and it shows extensive osteoarthritis in all three compartments of the knee. It shows markedly advanced degeneration and bone edema. This is what the MRI says. This isn't my characterization of it. It says huge condylar osteophytes in both the medial and lateral joint compartments. In two of the joint compartments, she had huge bone spurs. So she has objective evidence. The ALJ found that she could do less than a full range of sedentary work. Social Security rules say that work is defined as very heavy, heavy, medium, light, and sedentary. The ALJ said she couldn't do any of those, but she could do less than the full range of sedentary work. I'm just going to ask you about the April 2013 report we have from Dr. Weber because that's the one that I was just going back through my notes. There, the picture that emerges is of someone who certainly can't do any job that involves a lot of walking or standing, but it seems to me the implication is that she could do a job that would be classified as sedentary as of April 2013 based on this report. Then, of course, you jump ahead and get the later reports, and all of a sudden she can't do anything, and that's what I think the ALJ was reacting to. Well, wait a minute. Nothing seemed to have changed in that relatively short interval, and so I'm going to go with the earlier one because I think there was some suggestion that the later reports came after she had gotten involved in trying to get disability benefits and had been denied. So what is your response to that? So another thing that's in that April 2013 report that the ALJ didn't mention was that Dr. Weber had noted in his report that she was needing frequent breaks, and so, yes, she can be on her feet. The ALJ said she could be on her feet for only 20 minutes, which she said she could be on her feet 30 minutes to 60 minutes, and I think that's what Dr. Weber was saying. She could be on her feet for that, but she would need frequent breaks. Her husband said that she watches TV and reads, which were two reasons that the ALJ discredited her because she watched TV and read, but her husband says she does it lying down and with her leg elevated for over half the day. She consistently testified to that's what happens. Dr. Weber, when he was asked what about the need to lie down, he says, yes, she needs to lie down about four times a day because, out of medical necessity, she has chronic edema. And through those chart notes, it showed that in 2006 she wasn't having edema, but by 2008 she was having edema and chronic edema. She missed significant work, and that continued. Can I? Oh, I'm sorry. Go ahead. It just, I mean, I think I'm not sure that completely answers the question of what, that there was the sudden worsening in the conclusion with no explanation, in the described symptoms with no explanation of why they had gotten worse. And that brings up the question I wanted to ask you, which is, I read the ALJ as saying that Dr. Weber's conclusions are heavily based on the subjective reporting of symptoms given to him by Ms. Matthews, and given that the ALJ found her to be not credible, doesn't that necessarily discredit Weber's report that's based on her own reports? So this court has said in Ghanem's case that it's error for an ALJ to discredit a physician unless he relies heavily on the subjective reports. If he relies somewhat on it, then it's error. So he's got to rely heavily on it. What Dr. Weber said in his opinions that he wrote and authored were that she had chronic edema, she had severe leg shortening, she had severe osteoarthritis, that she was obese, and that she walked with a limp, and she had progressive back pain that he noted because of the condition with her knee and the way that she had to walk. He did send her to specialists. She did see Dr. Henderson, a rehabilitation specialist, during this period of time in 2008. That's reflected in Dr. Weber's chart notes. The ALJ said she saw no specialist. The ALJ said there was no indication that Dr. Weber said she used a cane, but in Dr. Weber's notes he said he talked to her about the cane and how it was causing problems with her right hand because she was using it so frequently, and talked about her using a forearm cane instead of a hand-held cane. That's significant because the medical community, Dr. Weber, knows that when you have a left leg impairment, you use the cane in the right hand. A person that's faking it doesn't know that. They could be using the left hand, right hand, but you use the cane in the right hand for a left leg impairment. And she had problems with her right hand because she was overusing the cane. What is so significant about that, Your Honor, is because the administrative law judge said she made inconsistent statements about the cane and they don't show up anywhere in Dr. Weber's reports. They did. The federal court said that was clear error and then said it was harmless. But this statement from the ALJ at 23, he, quote, such clear inconsistencies, talking about the cane, undermine not only the claimant's credibility, but also the credibility of the physician's opinion. To me, that jumps out. That is not harmless error when an ALJ makes those findings. That's okay. I'll pass. Okay. You've exceeded your time. So let's stop there. We'll hear from the government and we'll give you time for rebuttal. Thank you. Okay. Good morning, Your Honors. Joseph Langhammer on behalf of the commissioner. Ms. Matthews alleges that she's been disabled from a motorcycle accident from three decades ago, stemming primarily from a leg impairment. Yet for years after that, she worked up and through up to July of 2009, and she stopped working in July 2009 not because of her leg impairment, but because she was holding on to a check that she wasn't entitled to. When we look at the medical records, Judge Watford, as you pointed out, the alleged onset date is May 2011. When we look at the medical records since then and even medical records before then, we see that while she had leg swelling, her condition really remained unchanged for a period. And then in May 2011, there's really nothing remarkable about that date either. For example, in July 2011, the date that Dr. Weber said that Ms. Matthews was unable to work, she described her pain as tolerable. Again, in August 2011 and October 2011, she said that her pain was tolerable. She said that her pain was, quote, adequately controlled. She admitted in September 2012 of getting back to work.  Yes, Your Honor. Your Honor, on May 3, 2011, the physician doubled the dose of Oromorph. Does that seem consistent to you with someone who's not experiencing significant pain? No, it does not seem inconsistent to me. The commissioners, the ALJ did not find that Ms. Matthews did not have pain or that she was not severely limited. So then you would agree that the condition might be worsening, even though perhaps there was a time when it might have been stable, right? I'm not admitting that. I don't think that the ALJ found that her condition worsened to the extent that she was unable to work. So while, yes, there were some changes in medication around that time frame, she remained on very similar doses of medication throughout the relevant time frame. At one time it was increased four times, right? So not doubled, but quadrupled, right, the Oromorph? And that may be. I'm not entirely familiar with the exact date of that visit. But the key here is that the ALJ looked at those records during the relevant time frame and saw things like her admitting that her pain was adequately controlled. That was in September. I believe that was in September of 2012. She said it was effective in relieving her pain. The ALJ looked at that. Also looked at the fact that, yes, she certainly did have leg swelling. She certainly experienced severe limitations from her leg impairment. And the ALJ actually restricted her RFC, her residual functional capacity, to standing for just 20 minutes at a time, walking for just 20 minutes at a time, a total of two hours a day. Those are very significant restrictions. And even with those restrictions, a vocational expert testified that Ms. Matthews was able to perform work. So the ALJ did certainly account for Your Honor's point that Ms. Matthews did experience pain. She experienced leg impairments. However, not to the extent that she was completely unable to work. And the state agency doctor's opinion supports that notion, Dr. Hale's opinion. Well, let me ask you about that because, as I asked your opposing counsel, there were two reports issued by Dr. Weber, who was the treating physician for more than a decade. And those two reports indicated that she will have to lie down multiple times, up to one hour at a time, because of leg and back pain. Her back pain is progressive and there are no surgical options. And he opines that she will miss work four or more days per month. Now, those were two reports that Dr. Hale did not see and appear to be uncontradicted by anything in Dr. Hale's work, nor did I see it discussed in the ALJ's opinion. So those two reports are uncontradicted. What evidence is there that, in fact, the treating physician that everybody has given a great deal of weight to, to his or her opinions, where do we go from there? I mean, we've got two reports that are uncontradicted, right? I would disagree with the point that those opinions are uncontradicted. In the Ninth Circuit's Bayless case, for example, the question is, is there any medical opinion in the record, regardless of whether or not the state agency doctor, Dr. Hale, actually reviewed that opinion, in order to trigger the specific and legitimate standard of review? Dr. Hale's opinion is inconsistent with those later reports from Dr. Weber. And the reason for that is because Dr. Weber included a lot of limitations in there that actually are not contained in Dr. Hale's report. Now, you're correct, Dr. Hale only reviewed the April 2013 opinion. He didn't see those later opinions because they came after Dr. Hale reviewed them. But the ALJ, who is responsible for translating clinical findings and reviewing the medical opinions and formulating an RFC based on the record as a whole, that's under the agency's regulations, that's under this court's rounds decision, the ALJ is responsible for translating those findings into a succinct RFC. So the ALJ looked at Dr. Hale's opinion and found that it was in accord with the overall record, and then looked at the later opinions from Dr. Weber and found that, in fact, those opinions were not supported by the records in this case. For example, records showing from Dr. Weber's own notes, showing that, by and large, treatment was helping her. She admitted being, quote, unquote, quite active taking care of her grandchildren. The ALJ looked at that discrepancy and reasonably found that while Dr. Weber's earlier April 2013 opinion aligned with the overall record, his later opinions, which didn't find any support in either his notes in those opinions or in his treatment records, that that warranted giving those opinions less weight. And as Judge Miller pointed out, this court's decision in Tomasetti does permit the ALJ to discount a medical opinion, whether it's treating source or not, if that report is based on primarily, to a large extent, on a claimant's subjective complaints. So, for example, I think Mr. Tree pointed out that in April 2013, Dr. Weber opined that Ms. Matthews would have to lie down for large periods of time. He didn't actually opine that. That's contained on page 289 in her own subjective complaints. She said she needed to take frequent breaks. So that's a good example of where the ALJ's finding on that point is supported. That we don't agree with the ALJ's adverse credibility determination, then I take it you'd concede that there's no basis for then discounting Dr. Weber's later opinions, right? It all hinges on whether the adverse credibility determination can be upheld. I disagree with that. So let's assume she's completely credible, because I'm just telling you the ALJ's work on this is incredibly sloppy. I commend you at least for not trying to defend all of the grounds. But even the ones that you try to defend, to me, are not well supported. So let's assume that I were going to take the view that she's got to be deemed fully credible. And as I think both you and Judge Miller are suggesting, Dr. Weber's later opinions are based at least to some extent on her reporting subjective symptoms. So Dr. Weber has no basis for discounting those. Why in the world would we then not credit his later opinion at that point? Because the ALJ provided additional reasons. Judge Wofford, even if you disagree that Dr. Weber's later opinions relied largely on her subjective complaints, that was actually just one reason that the ALJ provided for discounting Dr. Weber's later opinions. So if we turn to page 24 of the ALJ's decision, yeah, 24 to 25 is where the ALJ analyzes Dr. Weber's 2013 opinions and 2015 opinions. And what he says is... Oh, yes, ER 24 to 25. So the ALJ cites the fact that Dr. Weber's opinion doesn't find any support in the treatment record. And when we look at what the ALJ said earlier, he goes through all of Dr. Weber's records and says, medication is working. She's staying active. Things like taking care of her grandchildren, things, you know, Dr. Weber's more restrictive opinion stands at odds with those notes. What would you find in the medical records that would tell you that somebody is lying when they say, I need to elevate my feet for an hour during the course of the day, that kind of thing? I think with respect to those specific limitations... That is ultimately the real problem she has. She can periodically stand and walk for a short... She's not even disputing that. The problem that renders her completely disabled, in her view, or in her counsel's view, is that she's going to have to take these breaks that no reasonable employer will be able to tolerate. And in addition, there are going to be a number of days during the month that you have to miss, right? That's the key limitation that the ALJ won't credit. And I guess my question to you is, okay, fine, we look at the medical records, and what is it that we would see in there that would in fact validate those? Because I'm not familiar with what we'd be looking for. Sure. So she's alleging, and I think Dr. Weber has also said that she would have to lie down for large portions of the day, take multiple breaks. But let's look at what the treatment records say during this relevant time frame. For example, in July 2011, this is the very month that Dr. Weber said she started to incur all of these limitations, in one of his opinions. She says, quote, she does feel her pain is adequately controlled. September 2012, she admitted that she was, quote, getting back to work, quote, quite busy taking care of her grandchildren. September 2012, she felt her medication was, quote, effective in relieving her pain, and she reported no significant side effects. That's at page ER 292. I'm sorry, what was the date of that last comment? September 2012. And if we look at Dr. Weber's notes... Getting back to that issue, on that same date, Dr. Weber did increase her pain medication. So she's not really adequately dealing with her pain. Otherwise, he would not have increased her pain medication, would he? Does that make sense? Well, the ALJ looked at these records over a course of time, and while there were fluctuations in the amount of medication she was receiving, the ALJ took a reasonable interpretation of the records under this Court's Batson decision, under this Court's Molina case. As long as the ALJ's interpretation of the record is reasonable, despite there being potentially an alternative rational interpretation, the Court should affirm. So the question is, is there substantial evidence to support the ALJ's interpretation of those medical records? And what the ALJ saw was, despite the... Substantial evidence to support the ALJ's decision when she says, yeah, my pain is controlled, but yet her physician doubles the amount of pain medication that she's taking. What's the substantial evidence that would contradict that? The substantial evidence is the ALJ looking at the longitudinal record here. So yes, if there was some increase in dosage at one point, there are multiple references in this record to plaintiff's pain being tolerable, that her pain was adequately controlled, that she was staying quite busy, and taking care of her grandchildren. So there is evidence that the ALJ looked at that, on a whole, showed that, despite some fluctuations in medication, she was not disabled. And again, I would remind the Court that the ALJ did afford significant limitations to this individual. Let me ask you a question. You said there's fluctuation in the medication. Is there any record that the pain medication was decreased? I'm unaware, Your Honor. I don't know if I have a specific site. I never saw it decreased. And I'm not sure if I can give Your Honor a specific page if that did occur. But I see my time is up, so unless the Court has any other questions. Could I just ask you briefly to address the harmless error analysis? I mean, given that you've conceded that some of the rationales for finding her not credible, you're not defending. Sure. So in Carmichael, this Court's decision in Carmichael, the Court said that even if some reasons are unpersuasive, if the Court finds some of the ALJ's rationale not supported by substantial evidence, as long as the ALJ did provide clear and convincing reasons at the end of the day supported by substantial evidence, the Court should still affirm. So here the ALJ cited, and these are the reasons that the agency is defending, the fact that the medical records didn't support the extent of allegations that she claimed were disabling, that she performed activities of daily living that stood at odds with some of her allegations, that she stopped working for reasons unrelated to her impairment, so she stopped working in 2009 because she held on to a check she wasn't entitled to and under the Court's brutal decision. That is a valid consideration and that the Court should uphold that finding. So the ALJ did provide reasons, to Judge Miller's point, the ALJ provided reasons that are still supported by substantial evidence, such that the Court should still affirm that finding. Okay. Thank you very much. Appreciate the argument. Let's put two minutes on the clock for rebuttal. Thank you. So there's two references in the file for Dr. Weber had said that she had tolerable pain levels. But that's not all that he said. He also said she had tolerable pain level on her current treatment regime. Her current treatment regime was that she had been increased on that same visit to four doses of morphine instead of three per day, that she was at maximum dosage of Vicodin. She no longer, unfortunately, because she had lost her insurance when she lost her job, she couldn't afford the gabapentin because that's a very expensive nerve medication. Her treatment regime was that she would elevate her leg, as confirmed by Dr. Weber and as confirmed by her husband and as testified to by herself, for about half the day. That's the normal way to treat edema, chronic edema, is to elevate your leg above heart level, so that the pumping of the heart does a better job of trying to control some of the edema. But she had chronic edema. So it wasn't that her pain was tolerable at work. At this time, she wasn't at work. The record shows she loved gardening. And much of the time while she was working, up until 2008, she was working full time, she was gardening a lot. That was a big hobby of hers. She said it killed me when I had to stop gardening. But when the doctor said that her pain level was tolerable on her treatment regime, she was no longer gardening, she was no longer working, she was laying down half the day elevating her leg.  Her doctor said if she had to go to work, her pain level no longer would be tolerable. She would miss four or more days of work per month. She needs to lay down and elevate her leg. If the court were to find that she became disabled on some date after May of 2011, Ms. Matthews would prefer the court to grant her an immediate award of benefits on that date, rather than to send it back. She desperately needs Medicaid. She still has no insurance and she needs insurance to be able to get the care that she needs for this severe condition. In 2012, they did increase her morphine to four times a day, which is near the daily maximum, along with the Vicodin. And that's the date where one of the references talks about tolerable pain with treatment regime. But it also says she had significant pain in both her knee and her ankle. She had improper gait, she had decreased range of motion in her knee and her ankle. She had deformity. We haven't even talked about the fact that the ALJ didn't develop the photo. He just said it's of no value to me, I'm not a physician. But it showed edema, it showed deformities, it showed what Dr. Weber stated in his reports were reasonable opinions, that she needs to elevate her leg, that she needs to lie down, that she would miss work. And he gave that report, his first report in December of 2013, if the court were to find, he said it went back to July of 2011, but if the court were to find even to December of 2013, she would much prefer that the court grant her benefits at some point, at least by May of 2011, as late as December of 2013 when he actually issued the report. Thank you.
judges: Watford, Miller, Benitez